1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   MATSUSHITA ELECTRIC INDUSTRIAL CO.,          No. C 05-3148 MMC
     LTD.,
12
                    Plaintiff,                    **ORDER GRANTING IN PART AND**
13                                                **DENYING IN PART DEFENDANTS/**
        v.                                        **COUNTERCLAIMANT'S MOTION FOR**
14                                                **SUMMARY JUDGMENT; GRANTING IN**
     MEDIATEK, INC., et al.,                      **PART AND DENYING IN PART**
15                                                **PLAINTIFF/COUNTERCLAIM**
                    Defendants                    **DEFENDANTS' MOTION FOR**
16                                                **SUMMARY JUDGMENT; DENYING**
     _____            **MOTIONS TO STRIKE**
17   MEDIATEK, INC,

                    Counterclaimant,
18
        v.
19
     MATSUSHITA ELECTRIC INDUSTRIAL CO.,
20   LTD., et al.

21                  Counterclaim Defendants

     _____/
22

23          Before the Court are two motions for summary judgment, both filed pursuant to Rule

24   56 of the Federal Rules of Civil Procedure:  (1) plaintiff/counterclaim defendant Matsushita

25   Electric Industrial Co., Ltd. ("Matsushita) and counterclaim defendant Panasonic

26   Corporation of North America's ("Panasonic") motion for summary judgment, filed April 6,

27   2007; and (2) defendant/counterclaimant MediaTek, Inc. ("MediaTek"), defendant OPPO

28   Digital, Inc. ("OPPO"), and defendant MSI Computer Corp.'s ("MSI") motion for summary

1 | judgment, filed April 6, 2007, as amended April 19, 2007.[1]

2 |     Also before the Court are two motions to strike:  (1) Matsushita and Panasonic's

3 | "Motion to Strike the Declarations of Jeffrey Bokor, Lee Soon Peng, Chao Chun Twu, and

4 | Steven Wasserman in Support of Defendants' Motion for Summary Judgment," filed April

5 | 20, 2007; and (2) MediaTek's "Motion to Strike New Arguments in Plaintiff's Reply Brief or

6 | in the Alternative, Request for Permission to File a Short Surreply," filed May 14, 2007.

7 |     Having reviewed the papers filed in support of and in opposition to each of the

8 | above-referenced motions, the Court rules as follows.[2]

9 | **LEGAL STANDARD**

10 |     Rule 56 provides that a court may grant summary judgment "if the pleadings,

11 | depositions, answers to interrogatories, and admissions on file, together with the affidavits,

12 | if any, show that there is no genuine issue as to any material fact and that the moving party

13 | is entitled to a judgment as a matter of law."  See Fed. R. Civ. P. 56(c).

14 |     The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

15 | Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co.

16 | v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary

17 | judgment show the absence of a genuine issue of material fact.  Once the moving party

18 | has done so, the nonmoving party must "go beyond the pleadings and by [its] own

19 | affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

20 | designate 'specific facts showing that there is a genuine issue for trial.'"  See Celotex, 477

21 | U.S. at 324 (quoting Rule 56(c)).  "When the moving party has carried its burden under

22 | Rule 56(c), its opponent must do more than simply show that there is some metaphysical

23 | doubt as to the material facts."  Matsushita, 475 U.S. at 586.  "If the evidence is merely

24 |

25 |     [1]The April 19, 2007 amendment reflects "clerical corrections to citations" only.  (See
26 | Defs.' Supplemental Unopposed Admin. Mot., filed April 19, 2007, at 2:15-16.)

27 |     [2]By order filed May 22, 2007, the Court vacated the May 25, 2007 hearing on the motions for summary judgment and on the motion to strike filed by Matsushita and
28 | Panasonic.  By order filed June 1, 2007, the Court vacated the June 8, 2007 hearing on defendants' motion to strike.

1  colorable, or is not significantly probative, summary judgment may be granted." Liberty

2  Lobby, 477 U.S. at 249-50 (citations omitted). "'[I]nferences to be drawn from the

3  underlying facts," however, "must be viewed in the light most favorable to the party

4  opposing the motion.'" See Matsushita, 475 U.S. at 587 (quoting United States v. Diebold,

5  Inc., 369 U.S. 654, 655 (1962)).

6  **DISCUSSION**

7  In the instant action, Matsushita alleges that MediaTek, OPPO and MSI have

8  infringed claims in three patents held by Matsushita.  In its counterclaim, MediaTek alleges

9  Matsushita and Panasonic have infringed claims in one patent held by MediaTek.

10  **A.  U.S. Patent 6,728,475 ("'475 Patent")**

11  In Count I of its complaint, Matsushita alleges defendants have infringed the '475

12  Patent.  Defendants argue they are entitled to summary judgment on the ground the '475

13  Patent is, as a matter of law, invalid pursuant to 35 U.S.C. § 102(b).

14  "A person shall be entitled to a patent unless . . . the invention was . . . in public use

15  or on sale in this country, more than one year prior to the date of the application for patent

16  in the United States."  See 35 U.S.C. § 102(b).  "The section 102(b) 'public use' and 'on

17  sale' bars are not limited to sales or uses by the inventor or one under the inventor's

18  control, but may result from activities of a third party which anticipate the invention, or

19  render it obvious."  In re Epstein, 32 F. 3d 1559, 1564 (Fed. Cir. 1994).  Here, defendants

20  rely on the "IBM Aptiva MPEG Player" ("Aptiva"), which defendants assert was sold in the

21  United States more than one year prior to October 31, 1997, the date of the application for

22  the '475 Patent, and which defendants further assert anticipates every limitation in the

23  claims set forth in the '475 Patent.

24  Claim 1, the first of two independent claims of the '475 Patent, claims a method,

25  wherein the first step is "decoding a coded data stream as a reproduction picture."  See

26  '475 Patent, col. 12 line 18.  Claim 8, the other independent claim of the '475 Patent, claims

27  an apparatus that includes "a decoder for decoding a coded data stream as a reproduction

28  picture."  See '475 Patent, col. 12 ll. 54-55.

3

1    According to defendants' expert Steven Wasserman ("Wasserman"), the Aptiva

2   includes a "controller" that decodes a coded data stream as a reproduction picture;

3   Wasserman's opinion is based on, inter alia, his interpretation of source code provided by

4   IBM.  (See Wasserman Decl., filed April 6, 2007, ¶¶ 26-28.)[3]  In opposition, Matsushita

5   relies on its expert Bradley W. Dickinson, Ph.D., who declares, based on his interpretation

6   of the source code, that the Aptiva does not include a device that decodes a coded data

7   stream as a reproduction picture.  (See Dickinson Decl., filed April 20, 2007, ¶¶ 28, 32.)

8   These conflicting opinions,[4] the Court finds, create a triable issue of fact as to whether the

9   Aptiva performs the step of "decoding a coded data stream as a reproduction picture"

10  and/or includes a "decoder for decoding a coded data stream as a reproduction picture."

11    Accordingly, as to the '475 Patent, defendants are not entitled to summary judgment

12  on the issue of invalidity pursuant to 35 U.S.C. § 102(b).

13  **B.  U.S. Patent 5,970,238 ("'238 Patent")**

14    In Count II of its complaint, Matsushita alleges defendants have infringed the '238

15  Patent.

16    Matsushita has asserted against defendants two claims in the '238 Patent,

17  specifically, Claims 22 and 23.

18    Claim 22 claims:

19    A semiconductor integrated circuit device comprising:

20    a wiring pattern formed in a wiring layer on a semiconductor substrate;

21    a first planarizing pattern composed of a group of identical simple geometric
22    figures and formed in a region of said wiring layer lying at a first specified
      distance or further away from said wiring pattern and at a second specified
23    distance from or closer to said wiring pattern, said second specified distance
      being larger than said first specified distance;

24  ───────────────

25    [3]Matsushita's motion to strike, to the extent it pertains to ¶¶ 31-34 and ¶¶ 46-57 of
    the Wasserman Declaration, will be denied as moot, because the Court has not considered said
26  paragraphs.  Further, defendants have asserted that they "do[ ] not rely on [¶¶ 46-57]
    at this time."  (See Defs.' Opp. to Pl.'s Mot. to Strike, filed May 4, 2007, at 18:6-8.)

27    [4]The Court has not set forth herein the precise nature of the experts' differing views
28  as to what is disclosed in the source code provided by IBM, in light of IBM's assertion in
    this litigation that the details of its source code pertaining to Aptiva are confidential.

a second planarizing pattern composed of at least one geometric figure larger than said simple geometric figure and formed in a region of said wiring layer lying at said second specified distance or further away from said wiring pattern; and

an interlayer insulating film formed over said wiring pattern, said first planarizing pattern, and said second planarizing pattern.

See '238 Patent, col. 38 ll. 41-59.

Claim 23 claims:

A semiconductor integrated circuit device comprising:

a first wiring pattern formed in a first wiring layer on a semiconductor substrate;

a second wiring pattern formed in a second wiring layer overlying or underlying said first wiring layer on said semiconductor substrate;

a first planarizing pattern composed of a group of identical simple geometric figures and formed in a region of said first wiring layer lying at a first specified distance or further away from said first wiring pattern, at a second specified distance from or closer to said first wiring pattern, said second specified distance being larger than said first specified distance, and at a third specified distance from or closer to said second wiring pattern;

a second planarizing pattern composed of at least one geometric figure larger than said simple geometric figure and formed in a region of said first wiring layer lying at said second specified distance or further away from said first wiring pattern and at said third specified distance or further away from said second wiring pattern; and

an interlayer insulating film formed between said first wiring pattern, said first planarizing pattern, and said second planarizing pattern each formed in said first wiring layer and said second wiring pattern formed in said second wiring layer.

See id., col. 38 ll. 60 - col. 40 ll. 9.

**1. Infringement**

Both parties seek summary judgment on the issue of infringement of the '238 Patent with respect to 50 accused devices.[5]

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent." See 35 U.S.C. § 271(a). "For literal infringement, each limitation of the claim must be met by the accused device exactly,

---

[5]A concise identification of the 50 accused devices is set forth in the Bokor Declaration.  (See Bokor Declaration, filed April 6, 2007, ¶¶ 44, 50, 59, 73.)

1    any deviation from the claim precluding a finding of infringement."  Lantech, Inc. v. Keip

2    Mach. Co., 32 F. 3d 542, 547 (Fed. Cir. 1994).  "Even if the accused device or process

3    does not literally infringe, it may infringe under the doctrine of equivalents if the differences

4    between the claimed invention and the accused device or process are insubstantial."

5    Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F. 3d 1558, 1563-64 (Fed. Cir.

6    1996) (internal quotations and citation omitted).  "To be a substantial equivalent, the

7    element substituted in the accused device for the element set forth in the claim must not be

8    such as would substantially change the way in which the function of the claimed invention

9    is performed."  Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F. 2d 1528, 1532-33

10   (Fed. Cir. 1987) (internal quotations omitted).  Stated otherwise, "the accused devices must

11   still perform substantially the same function in substantially the same way to obtain the

12   same result."  See id. at 1535.

13        With respect to five of the accused devices, specifically, B65169D, UE65189G,

14   SE65189F, VE65189F, and BE65189C, Matsushita relies on the opinion of its expert

15   Martin G. Walker, Ph.D. ("Dr. Walker"), who offers, in a non-conclusory manner, his

16   opinion that each said device meets every limitation in claims 22 and 23; defendants rely

17   on the opinion of their expert Jeffrey Bokor, Ph.D. ("Dr. Bokor"), who offers, in a non-

18   conclusory manner, his opinion that each said device does not meet every limitation in

19   claims 22 and 23.  As to said accused devices, the Court finds a triable issue of fact exists

20   as to whether each such device infringes claims 22 and 23:  (1) B65169D, (see Badini

21   Decl., filed April 6, 2007, Ex. 1 ¶¶ 79-90 and Ex. H thereto;[6] Bokor Decl. ¶¶ 44-49[7]);

22   (2) UE65189G, (see Walker Decl. ¶¶ 6-9, 19-21; Badini Decl. Ex. 1 ¶¶ 54-73 and Ex.;

23

24        [6]Defendants' objection on hearsay grounds to Dr. Walker's expert report is
25   overruled; Dr. Walker has incorporated the contents of his expert report into his declaration.
     (See Walker Decl., filed April 20, 2007, ¶ 2.)

26        [7]Matsushita's motion to strike, to the extent it pertains to the Bokor Declaration, will
27   be denied.  Although Matsushita argues portions of the declaration contain legal
     conclusions, Matsushita fails to identify with any particularity such portions.  In any event,
28   the paragraphs on which the Court has relied are, as set forth above, non-conclusory in
     nature.

1  Bokor Decl. ¶¶ 73-83); (3) SE65189F, (see Badini Decl. Ex. 1 ¶ 93 and Ex. I thereto; Bokor

2  Decl. ¶¶ 73-75, 78-82); (4) VE65189F, (see Badini Decl. Ex. 1 ¶ 93 and Ex. J thereto;

3  Bokor Decl. ¶¶ 73-75, 78-83); and (5) BE65189C, (see Badini Decl. Ex. 1 ¶ 93 and Ex. K

4  thereto; Bokor Decl. ¶¶ 73-75; 78-83).

5       With respect to the remaining 45 devices, defendants correctly observe that

6  plaintiff's expert, Dr. Walker, does not set forth a particularized opinion.[8]  Accordingly,

7  defendants contend, they are entitled to summary judgment as to a claim of infringement

8  based on the remaining 45 accused devices.  Matsushita argues, however, that it is entitled

9  to summary judgment as to its claim based on the remaining 45 accused devices, or,

10  alternatively, that a triable issue of fact exists as to infringement based on such devices, in

11  light of testimony offered by a MediaTek employee at a Rule 30(b)(6) deposition, which

12  testimony, Matsushita asserts, constitutes an admission that the "planarizing patterns"

13  present in the B65169D product are "present throughout all of MediaTek's accused

14  devices."  (See Pl.'s Opp. to Defs.' Mot. for Summ. J., filed April 20, 2007, at 19:21-24.)

15  The Court is not persuaded by Matsushita's argument.

16       First, Matsushita fails to explain how an "admission" by MediaTek is admissible

17  against OPPO and MSI.  Second, as to all three defendants, the testimony on which

18  Matsushita relies, specifically, the testimony of Wei-Fu Hsu ("Hsu"), cannot reasonably be

19  interpreted in the manner suggested by Matsushita.  Hsu was asked how, after MediaTek

20  had concluded that MediaTek's "1369" device did not infringe the '238 Patent,[9] MediaTek

21  formed the belief that other MediaTek devices likewise did not infringe.  (See Badini Decl.

22  //

23

---

24       [8]With respect to the accused devices he did not specifically analyze, Dr. Walker
   states that "MediaTek did not make the mask data available for some or all of the layers of
25  any of these devices or gave [Dr. Walker] only a very limited amount of time to inspect the
   mask files for these devices."  (See Badini Opp. Decl., filed April 20, 2007, Ex. 90 ¶ 94.)
26  Matsushita, however, has not sought relief under Rule 56(f) or otherwise in light of the
   concerns expressed by Dr. Walker.
27

28       [9]The parties agree that "1369" is a reference to the MediaTek device identified as
   "B65169D."  (See Bokor Decl. ¶ 44; Pl.'s Mot. for Summ. J. at 6:8-10.)

1  Ex. 25 at 363:7-10.)  Hsu answered as follows:

2      Matsushita gave us a product, the 1369.  That's all we have.  And based on
       our analysis and discussion with Matsushita, we have idea that we don't
3      infringe this patent and we did not  – we do not make the chip by ourselves,
       assumed that – that's how we believe – all the chips probably have the similar
4      feature like this 1369 chip Matsushita claimed they're reverse engineering
       from.  Although the belief may be correct, may be incorrect, we don't know.[10]
5

6  (See id. Ex. 25 at 364:14-23.)  When asked if he thought such belief by MediaTek was

7  "reasonable," Hsu answered, "A lot of our products use similar, are made by our foundries

8  we believe use similar techniques, so I believe we have no reason to doubt that this is not a

9  reasonable belief."  (See id. Ex. 25 at 364:25 - 365:6.)

10     The above-quoted testimony cannot be reasonably interpreted as an admission that

11 each of MediaTek's accused devices has, in fact, the same "planarizing patterns" as the

12 B65169D device.  Rather, as noted, Hsu stated that MediaTek "believed" the third-party

13 foundries who manufacture the accused devices use "similar" techniques when making the

14 devices.  Even assuming, arguendo, Hsu's statement constitutes evidence that the third-

15 party foundries, in fact, use "similar" manufacturing techniques, Matsushita points to no

16 evidence that a foundry's use of "similar" manufacturing techniques would result in that

17 foundry's manufacturing devices with the same "planarizing patterns" that are present in the

18 B65169D device.  Consequently, the Court finds Matsushita has failed to create a triable

19 issue of fact as to whether the remaining 45 devices have the same features as the

20 B65169D device.

21     Accordingly, defendants are entitled to summary judgment, and Matsushita is not

22 entitled to summary judgment, on the issue of infringement, to the extent Matsushita's

23 claim of infringement is based on devices other than B65169D, UE65189G, SE65189F,

24 VE65189F, and BE65189C.[11]

25
26     [10]None of the defendants manufacture the devices at issue herein; rather, third-party
   "foundries" manufacture the devices.  (See Badini Decl. Ex. 25 at 365:13-16.)
27
       [11]In making such finding, the Court has not found it necessary to consider the
28 declarations of Lee Soon Peng or Chao Chun Twu.  Accordingly, Matsushita's motion to
   strike such declarations will be denied as moot.

1    **2. Invalidity**

2         Matsushita argues defendants cannot establish their defenses that claims 22 and 23

3    are invalid under the theories of anticipation, obviousness, or failure to disclose the best

4    mode.

5              **a. Anticipation**

6         "A prior art reference anticipates a patent claim if the reference discloses, either

7    expressly or inherently, all of the limitations of the claim."  EMI Group North America, Inc.,

8    v. Cypress Semiconductor Corp., 268 F. 3d 1342, 1350 (Fed. Cir. 2001).  "[A] limitation or

9    the entire invention is inherent and in the public domain if it is the natural result flowing from

10   the explicit disclosure of the prior art."  Schering Corp. v. Geneva Pharmaceuticals, Inc.,

11   339 F. 3d 1373, 1379 (Fed. Cir. 2003) (internal quotation and citation omitted).

12        Defendants' expert, Dr. Bokor, has offered the opinion that each limitation set forth in

13   claims 22 and 23 is found in U.S. Patent 5,798,298 ("Yang"), and, further, that each

14   limitation set forth in claims 22 and 23 is found is U.S. Patent 5,597,668 ("Nowak").  Both

15   Yang and Nowak disclose methods for generating planarizing patterns.  In his expert

16   report, Dr. Bokor sets forth, in a non-conclusory manner, the basis for his opinion,

17   specifically, his opinion that when the methods claimed in Yang and Nowak are applied to a

18   wiring pattern "made up of a series of parallel wires," the resulting device includes every

19   limitation in claims 22 and 23.  (See Badini Decl. Ex. 23 ¶¶ 101-111 (setting forth opinion as

20   to why claims 22 and 23 are anticipated by Yang); id. Ex. 23 ¶¶ 101-102, 112-117 (setting

21   forth opinion as to why claims 22 and 23 are anticipated by Nowak); see also Chou Decl.,

22   filed April 20, 2007, Ex. G at 178:20-23 ("The point I'm making is that if you follow the

23   teaching of Yang, if you have a particular wiring layer, you inevitably would get a pattern

24   that's represented by [claim 22]").)

25        Matsushita argues that Dr. Bokor's opinion is, as a matter of law, insufficient to

26   support a finding of anticipation, because neither Yang nor Nowak disclose that the

27   methods respectively set forth therein can be applied to a wiring pattern "made up of a

28   series of parallel wires."  As a consequence, Matsushita argues, a trier of fact could not

9

1  reasonably find, based on Dr. Bokor's opinion, that either Yang or Nowak inherently

2  discloses the claimed invention.  The Court disagrees.

3      Although, as Matsushita points out, the specification of neither Yang nor Nowak

4  addresses whether the methods claimed in said references can be performed with a wiring

5  pattern "made up of a series of parallel wires," Matsushita does not point to any language

6  therein that limits use of the disclosed methods to only the specific patterns identified in the

7  preferred embodiments or to particular shapes of wiring patterns.  Dr. Bokor has offered the

8  opinion, undisputed by Matsushita at least for purposes of the instant motion, that a wiring

9  pattern "made up of a series of parallel wires" was "well known and commonly used in the

10  art at the time [of the prosecution of the '238 Patent]."  (See Badini Decl. Ex. 23

11  ¶ 111.)  Consequently, a trier of fact could reasonably find, based on Dr. Bokor's testimony,

12  that if a person skilled in the art employed the methods explicitly disclosed in Yang and

13  Nowak with a "well known and commonly used" wiring pattern, (see id.), the "natural result"

14  of such use would be the device claimed in claims 22 and 23.  See Schering Corp., 339 F.

15  3d at 1379.

16      Accordingly, as to claims 22 and 23, Matsushita is not entitled to summary judgment

17  on the issue of invalidity predicated on anticipation.

18          **b. Obviousness**

19      A patent claim is invalid based on obviousness when the "differences between the

20  [claimed invention] and the prior art are such that the subject matter as a whole would have

21  been obvious at the time the invention was made to a person having ordinary skill in the

22  art."  See 35 U.S.C. § 103(a).

23      Defendants' expert, Dr. Bokor, has offered the opinion that claims 22 and 23 are

24  obvious in light of Yang alone or in combination with U.S. Patent 5,032,890 ("Ushiku"), and

25  further are obvious in light of Nowak alone or in combination with Ushiku.

26      Matsushita argues the above-stated opinion by Dr. Bokor cannot, as a matter of law,

27  support a finding of obviousness because Dr. Bokor's opinion is conclusory in nature.  The

28  Court disagrees; the factual basis for Dr. Bokor's opinion is set forth in his expert report in a

10

1  non-conclusory manner.  (See Badini Decl. Ex. 23 ¶¶ 121-29.)  Matsushita also argues that

2  Dr. Bokor does not identify a "motivation in the prior art that would lead one to make the

3  modifications to [the prior art] reference[s] that are necessary to reach the claimed

4  invention."  (See Pl.'s Mot. for Summ. J. at 30:20-21.)  A finding of obviousness, however,

5  is not dependent on a showing that the motivation to combine can be found in the prior art.

6  See KSR International Co. v. Teleflex Inc., 127 S. Ct. 1727, 1739-41 (2007); see also

7  Motorola, Inc. v. Interdigital Tech. Corp., 121 F. 3d 1461, 1472 (Fed. Cir. 1997) (holding no

8  requirement exists that prior art contain suggestion to combine known elements to achieve

9  claimed invention; noting suggestion can be found in "knowledge generally available to one

10 of ordinary skill in the art").

11         Accordingly, as to claims 22 and 23, Matsushita is not entitled to summary judgment

12 on the issue of invalidity predicated on obviousness.

13                    **c. Best Mode**

14         "A patent specification must 'set forth the best mode contemplated by the inventor

15 for carrying out his invention'."  Minco, Inc. v. Combustion Engineering, Inc., 95 F. 3d 1109,

16 1115 (Fed. Cir. 1996) (quoting 35 U.S.C. § 112).  "To invalidate a patent under the best

17 mode requirement, an accused infringer must show by clear and convincing evidence that

18 the inventor both knew of and concealed a better mode of carrying out the claimed

19 invention than was set forth in the specification."  Id.  Further, "[t]he record must show that

20 the inventor considered [the] alternative mode superior to the disclosed mode."  Id. at 1115-

21 16.

22         Matsushita argues defendants lack evidence to establish that the inventors of the

23 '238 Patent were aware of a mode to carry out the claimed invention that is different from

24 the mode set forth in the specification, and, further, that they were aware that any such

25 undisclosed mode was superior to the disclosed mode.

26         In opposition, defendants rely on the testimony of Hidenori Shibati ("Shibati"), one of

27 the inventors of the '238 Patent.  At his deposition, when Shibati was shown a picture of a

28 particular "pattern" and asked whether he could tell if said pattern was "within [the]

invention," (see Chou Decl. Ex. I at 112:9-11), he responded that he could not tell from the picture alone, and that he would need to know, inter alia, "how much parasitic capacitance can be allowed to occur," (see id. Ex. I at 115:3-20).  Shibati also stated he knew of an "equation" that can be used to calculate parasitic capacitance.  (See id. Ex. H at 45:16-21).

Defendants assert, and Matsushita does not dispute, that the specification of the '238 Patent does not disclose an equation to calculate parasitic capacitance.  Defendants fail, however, to offer any evidence that such equation constitutes a mode of carrying out the claimed invention.  Moreover, even if said equation could be considered an alternative mode, defendants point to no evidence, either direct or circumstantial, that either Shibati or the other named inventor, Kazuo Tsuzuki, considered said equation to be a mode superior to the modes disclosed in the specification of the '238 Patent. See Studiengesellschaft Kohle mbH v. Eastman Kodak Co., 616 F. 2d 1315, 1340 (Fed. Cir. 1980) (holding "mere fact that [the inventor] knew of other uses of his catalysts does not create a presumption that he contemplated or appreciated those uses to be the best mode of carrying out his invention").

Accordingly, as to claims 22 and 23, Matsushita is entitled to summary judgment on the issue of invalidity predicated on the best mode requirement.

**C.  United States Patent 5,548,249 ("'249 Patent")**

In Count III of its complaint, Matsushita alleges defendants have infringed the '249 Patent.  Defendants argue they are entitled to summary judgment on the ground Matsushita lacks evidence to establish that any of the accused devices meet each limitation of the asserted claims, specifically, Claims 1 through 3 of the '249 Patent.

Claim 1 claims:

A clock generator comprising:

input shutoff control means for receiving a base clock and a reference clock and outputting a first signal and a second signal in response to the reset signal;

phase comparison means for outputting a phase difference signal indicating a phase difference between the first signal and the second signal;

voltage control oscillation means for outputting a frequency variable clock in correspondence with the phase difference signal; and

voltage fixing control means for controlling a voltage of the phase difference signal in response to the reset signal,

wherein, when the reset signal is in a first level, the input shutoff control means outputs the base clock to the phase comparison means as the first signal and outputs the reference clock to the phase comparison means as the second signal, and the voltage fixing control means holds the voltage of the phase difference signal, and

when the reset signal is in a second level different from the first level, the input shutoff control means outputs two signals to the phase comparison means as the first signal and the second signal, the phase difference between the two signals being substantially zero, and the voltage fixing control means fixing the voltage of the phase difference signal to a predetermined voltage at which the voltage control oscillation means does not oscillate.

See '249 Patent, col. 23 ll. 4-32.

Claim 2 claims "[a]n apparatus comprising detection means for outputting a reset signal in response to a predetermined condition, a clock generator for generating a clock, and a circuit portion operating in correspondence with the clock, the clock generator including" the same elements set forth in Claim 1. See '249 Patent, col. 23 ll. 33-65.

Claim 3 claims:

A method for generating a clock by use of an apparatus including phase comparison means for receiving a base clock and a reference clock and outputting a phase difference signal indicating a phase difference between the base clock and a reference clock, and voltage control oscillation means for outputting a frequency variable clock in correspondence with the phase difference signal, the method comprising the steps of:

making the phase difference between the base clock and the reference clock substantially zero in response to a reset signal; and

fixing a voltage of the phase difference signal to a predetermined voltage at which the voltage control oscillation means does not oscillate in response to a reset signal.

See '249 Patent, col. 23 ll. 66 - col. 24 ll. 13.

**1. MT1155**

Defendants argue that one accused device, specifically, "MT1155," has an "all digital" design, (see Hsu Decl., filed April 6, 2007, ¶ 6); Matsushita offers no evidence to the contrary. Defendants also offer evidence that Chih-Kong Yang, Ph.D., ("Yang"),

13

1   Matsushita's expert on the issue of infringement as to the asserted claims of the '249

2   Patent, did not analyze the structure of any accused device with a digital design.  (See

3   Corrected Cannon Decl., filed April 19, 2007, Ex. 2 at 46:21 - 50:3.)  Consequently,

4   defendants argue, Matsushita lacks evidence to establish MT1155 meets each limitation of

5   the asserted claims.  See Exigent Tech., Inc. v. Atrana Solutions, Inc., 442 F. 3d 1301,

6   1307-08 (Fed. Cir. 2006) (holding where party moving for summary judgment does not

7   have burden of proof on issue, "burden on [movant] may be discharged by showing – that

8   is, pointing out to the district court – that there is an absence of evidence to support the

9   nonmoving party's case").  In its opposition, Matsushita fails to respond to defendants'

10  argument, much less point to the existence of any evidence indicating Matsushita can

11  establish MT1155 meets each limitation of the asserted claims.

12      Accordingly, defendants are entitled to summary judgment on the issue of

13  infringement of the '249 Patent, to the extent Matsushita's claim is based on MT1155.

14      **2.  Accused Devices Other Than MT1155**

15      With respect to the remaining accused devices, defendants argue Matsushita lacks

16  evidence to establish said devices meet four limitations in Claims 1, 2 and 3, either literally

17  or under the doctrine of equivalents.[12]

18      In that regard, the Court notes at the outset that Matsushita does not advance a

19  specific argument that each limitation in Claim 3 is literally present in the accused devices.

20  Indeed, Dr. Yang, Matsushita's expert, offers only the opinion that the accused devices

21  infringe Claim 3 under the doctrine of equivalents.  (See Badini Opp. Decl. Ex. 101

22  ¶ 158.)[13]  Consequently, the Court considers whether, for purposes of infringement of

23  _____

24      [12]Defendants assert, for purposes of the instant motion, that the remaining accused
    devices should be treated in the same manner for purposes of analysis under the '249
25  Patent  (See Defs.' Amended Mot. for Summ. J. at 22:14-20.)  Matsushita states no
    opposition to treating the remaining devices in the same manner and, indeed,
26  acknowledges that its expert "expressly addresses" only one accused device in his expert
    report.  (See Pl.'s Opp. to Defs.' Mot. for Summ. J. at 22:7-9.)  Accordingly, the Court will
27  discuss the remaining accused devices together for purposes of the '249 Patent.

28      [13]By contrast, with respect to Claims 1 and 2, Dr. Yang offers the opinion that the
    accused devices literally infringe each limitation.  (See id. Ex. 101 ¶ 32.)

1   Claims 1 and 2, the accused devices meet the subject four limitations either literally or

2   under the doctrine of equivalents, and whether, for purposes of infringement of Claim 3, the

3   accused devices meet the subject four limitations under the doctrine of equivalents.

4       For the reasons set forth below, the Court finds Matsushita lacks evidence to

5   establish the accused devices literally meet the "base clock" limitation, and, accordingly,

6   defendants are entitled to summary judgment on the issue of literal infringement of the '249

7   Patent.  The Court further finds, however, that Matsushita has offered sufficient evidence to

8   support a finding that the accused devices contain a substantial equivalent to the "base

9   clock" limitation and that plaintiff has offered sufficient evidence to support a finding that the

10  accused devices literally meet the remaining limitations; accordingly, defendants are not

11  entitled to summary judgment on the issue of infringement under the doctrine of

12  equivalents as to products other than MT1155.

13              **a. Base Clock**

14      Defendants first argue Matsushita cannot demonstrate the accused devices meet

15  the "base clock" limitation.  The parties agree a "base clock" is a periodic signal.  (See

16  Defs.' Amended Mot. for Summ. J. at 23:2-11; Corrected Cannon Decl. Ex. 2 at 215:21-

17  22.)

18      Dr. Yang, Matsushita's expert, states his review of the accused devices "does not

19  indicate the direct presence of any base clock," and, consequently, he does not opine that

20  the accused devices literally infringe Claim 3.  (See Badini Opp. Decl. Ex. 101 ¶ 158.)  With

21  respect to Claims 1 and 2, however, Matsushita argues it has sufficient establish to

22  establish literal infringement.

23      The term "base clock" is, with respect to Claims 1 and 2, contained in a means-plus-

24  function limitation.  Specifically, the "input shutoff control means" claimed therein performs

25  certain specified functions, including "receiving a base clock."  (See Order Construing

26  Claims, filed November 9, 2007, at 7:10-19.)  An accused device does not "literally meet" a

27  means-plus-function limitation, unless the means in the accused device performs the

28  "identical function" set forth in the claim.  See Kemco Sales, Inc. v. Control Papers Co.,

1    208 F. 3d 1352, 1364 (Fed. Cir. 2000) (holding accused device does not "literally meet"

2    means-plus-function limitation where device "does not perform the identical function" set

3    forth in claim).  Dr. Yang offers the opinion that the accused devices have a structure

4    corresponding to the "input shutoff control means" and that such structure "receive[s] a

5    signal labeled EFMI."  (See Yang Decl., filed April 20, 2007, ¶¶ 11-12.)  Defendants do not

6    dispute such testimony; rather, defendants rely on Dr. Yang's testimony that the EFMI

7    signal is not a base clock, (see Corrected Cannon Decl. Ex. 2 at 216:15-20; see also id. at

8    231:10-11 (stating "the base clock itself has characteristics that the EFMI signal does not"),

9    and argue that the "input shutoff control means" in the accused devices receives a base

10   clock.  In its opposition, Matsushita points to no evidence, in the form of expert testimony or

11   otherwise, that the "input shutoff control means" in the accused devices receives a base

12   clock.

13            Consequently, for purposes of infringement of claims 1, 2, and 3, Matsushita lacks

14   evidence to establish the accused devices literally meet the "base clock" limitation.

15            With respect to the doctrine of equivalents, defendants rely on the opinion of Ahmad

16   R.S. Bahai, Ph.D. ("Dr. Bahai"), who offers the opinion, in a non-conclusory manner, that

17   the differences between the invention's "base clock" signal and the accused device's EFMI

18   signal are substantial, (see Bahai Decl., filed April 6, 2007, ¶¶  71-73), while Matsushita

19   relies on the opinion of Dr. Yang, who offers the opinion, in a non-conclusory manner, that

20   any differences are insubstantial, (see Yang Decl. ¶ 21; Badini Opp. Decl. Ex. 101 ¶¶ 162-

21   64).  The Court finds the above-described dispute creates a triable issue of fact as to

22   whether the EFMI signal is equivalent to the claimed base clock.

23                              **b. "A Phase Difference Signal"**

24            Defendants argue Matsushita lacks evidence to establish the accused devices meet

25   the limitation "a phase difference signal."  Defendants assert, and Matsushita does not

26   dispute, that the accused devices have two signals that collectively indicate a phase

27   difference, specifically, "PDP_UP" and "PDP_DN."  Defendants argue the term "a phase

28   difference signal" should be construed as "one phase difference signal."  If such

16

1    construction is adopted, Matsushita would, according to defendants, be unable to establish

2    that the accused devices literally meet the "a phase difference signal" limitation.

3           "'[A] or 'an' in patent parlance carries the meaning of 'one or more' in open-ended

4    claims containing the transitional phrase 'comprising.'" KCJ Corp. v. Kinetic Concepts, Inc.,

5    223 F. 3d 1351, 1356 (Fed. Cir. 2000).  "Unless the claim is specific as to the number of

6    elements, the article 'a' receives a singular interpretation only in rare circumstances when

7    the patentee evinces a clear intent to so limit the article." Id.; cf. Insituform Technologies,

8    Inc. v. Cat Contracting, Inc., 99 F. 3d 1098, 1105-06 (Fed. Cir. 1996) (holding claim term "a

9    cup" properly construed as "one cup," where another limitation would be "eliminate[d]" if

10   there was more than one cup, the specification and drawings only referred to one cup, and

11   patentee conceded "the patent discloses a single vacuum cup").

12          Here, defendants argue that Matsushita has evidenced a clear intent to limit the

13   scope of the claim to a single phase difference signal.  The Court disagrees.

14          Defendants first rely on the fact that the claims, after referring to "a phase difference

15   signal," later refer to said limitation as "the phase difference signal."  See, e.g., '249 Patent,

16   col. 23 ll. 9-10, col. 23 ll. 13-14.  This argument is unpersuasive because, "[l]ike the words

17   'a' and 'an,' the word 'the' is afforded the same presumptive meaning of 'one or more' when

18   used with the transitional phrase 'comprising.'" See Free Motion Fitness, Inc. v. Cybex Int'l,

19   Inc., 423 F. 3d 1343, 1350-51 (Fed. Cir. 2005) (rejecting argument that "use of the word

20   'the' in connection with the word 'cable' later in the claim shows that the earlier reference to

21   'a' denotes singularity").

22          Defendants next argue the requisite clear intent to so limit the claims is present

23   because the preferred embodiments have only one phase difference signal.  References to

24   a preferred embodiment having a singular element, however, do not evidence a clear intent

25   to limit the scope of the invention to one element, where, as here, the claim language is not

26   so limiting.  See id. (holding "references to a single cable" in specification's description of

27   preferred embodiment "do not evince a clear intent by the patent to limit the article to the

28   singular").

                                              17

1    Finally, defendants observe that the claimed "phase difference signal" is an output of

2 the "phase comparison means," which is the "phase comparator" illustrated as "11" in

3 Figure 1 of the specification, (see Order Construing Claims at 8-12), and argue that Figure

4 1 should be understood as illustrating that only one phase difference signal is output from

5 the phase comparator.  Defendants, however, fail to point to any language in the

6 specification indicating the disclosed structure can only output a single phase difference

7 signal, and fail to offer any evidence that a person skilled in the art would necessarily

8 interpret Figure 1 as allowing for output of only one phase difference signal.

9    Consequently, the term "a phase difference signal" is properly construed as "one or

10 more phase difference signals."[14]

11    Accordingly, defendants have not shown Matsushita lacks evidence to establish the

12 accused devices literally meet the "phase difference signal" limitation.

13        **c. "Fixing the Voltage of the Phase Difference Signal to a Predetermined**
         **Voltage"**
14
      Defendants argue Matsushita lacks evidence to establish the accused devices meet
15
   the limitation "fixing the voltage of the phase difference signal to a predetermined voltage."
16
      The "voltage of the phase difference signal" is "controll[ed]" by the "voltage fixing
17
   control means."  See '249 Patent, col. 23 ll. 15-17.  Matsushita's expert Dr. Yang has
18
   identified structures in the accused devices that, in his view, constitute a "voltage fixing
19
   control means," and offers the opinion that such structures "control" the voltages of the
20
   "AOP" and "AON" signals.  (See Yang Decl. ¶¶ 51-53.)  Although defendants assert that Dr.
21
   Yang has not offered the further opinion that the voltages of the AOP and AON signals
22
   contain the voltages of the "phase difference signal," defendants are incorrect.  Specifically,
23
   as Matsushita points out, Dr. Yang has offered the opinion that the AOP and AON signals
24

25    [14]Even if the Court were to construe "a phase difference signal" to mean "one phase
26 difference signal," defendants would not be entitled to summary judgment, because
   Matsushita has offered evidence to establish a triable issue under such construction as
27 well.  Specifically, Dr. Yang opines that "PDP_UP and PDP_DN work together to indicate a
   phase difference," and that "'pump-up' and 'pump-down' signals such as [PDP_UP and
28 PDP-DN] are common in the art of PPL design and, because of their complementary
   nature, are often referred to as a single phase difference signal."  (See Yang Decl. ¶ 36.)

1   "contain the same phase information" as the "phase information from the 'PDP_UP' and

2   'PDP_DN'" signals, because the phase information from the PDP_UP and PDP_DN signals

3   is "embedded in the voltage levels of the 'AOP' and 'AON' signals."  (See Badini Opp. Decl.

4   Ex. 101 ¶ 85.)[15]

5        Accordingly, defendants have failed to show Matsushita lacks evidence to establish

6   the accused devices do not literally meet the "fixing the voltage of the phase difference

7   signal to a predetermined voltage" limitation.

8                    **d.  "Voltage Control Oscillation Means"**

9        Defendants argue Matsushita lacks evidence to establish the accused devices meet

10   the limitation "voltage control oscillation means."

11        The term "voltage control oscillation means" was not previously construed by the

12   Court.  Defendants argue that "voltage control oscillation means" is subject to means-plus-

13   function construction, and that the function performed by said means is "outputting a

14   frequency variable clock in correspondence with the phase difference signal," (see Defs.'

15   Amended Mot. for Summ. J. at 28:6-15); Matsushita does not state any disagreement

16   therewith.  Defendants next argue that the corresponding structure is a "'voltage control

17   oscillator 13' that has a predetermined voltage at which it does not oscillate," (see id. at

18   28:15-17);[16] Matsushita does not dispute that the corresponding structure is "voltage

19   control oscillator 13," but disputes that said oscillator must have a predetermined voltage at

20   

21        [15]To the extent defendants may be arguing that Dr. Yang, at his deposition, testified
22   in a manner contrary to that set forth in his expert report, the specific excerpt on which
     defendants rely, (see Cannon Decl. Ex. 2 at 158:13-159:15), is, at best, ambiguous as to
23   Dr. Yang's views concerning the relationship between the PNP_UP/PNP_DN signals and
     the AOP/AON signals.  "The general rule in the Ninth Circuit is that a party cannot create
24   an issue of fact by an affidavit contradicting prior deposition testimony."  Kennedy v. Allied
     Mutual Ins., 952 F. 2d 262, 266 (9th Cir. 1991).  Here, however, Dr. Yang gave his
25   deposition testimony after he prepared his written report, and did not, at least in the excerpt
     provided by defendants, purport to retract or otherwise amend his prior opinion with respect
26   to the nature of the AOP/AON signals.  In any event, the above-referenced "general rule"
     applies only if the district court makes "a factual determination that the contradiction was
27   actually a 'sham'," see id. at 267, and defendants have not shown such a factual
     determination is warranted herein.

28        [16]The voltage control oscillator is illustrated as "13" in Figure 1 of the '249 Patent.

1   which it does not oscillate.  Matsushita's position is not persuasive because each asserted

2   claim includes the limitation that the "voltage control oscillator means does not oscillate" at

3   a "predetermined voltage," specifically, a "predetermined voltage" of the "phase difference

4   signal."  See '249 Patent, col. 23 ll. 29-32; id., col. 23 ll. 61-62; id., col. 24 ll. 10-13.

5          Accordingly, the Court agrees with defendants that "voltage control oscillation

6   means" is subject to means-plus-function construction, that the function performed by said

7   means is "outputting a frequency variable clock in correspondence with the phase

8   difference signal," and that the corresponding structure is "voltage control oscillator 13 that

9   has a predetermined voltage at which it does not oscillate."

10         With respect to the issue of infringement, defendants argue Matsushita lacks

11  evidence to prove the voltage control oscillator ("VCO") in the accused devices oscillates at

12  a predetermined voltage.  Dr. Yang has, however, offered a non-conclusory opinion that

13  when the voltage of the AOP and AON signals are at a "predetermined voltage,"

14  specifically, when the AOP and AON signals in the "lpfvti38 block" are at a "high level," the

15  VCO in the accused devices does not oscillate.  (See Badini Opp. Decl. Ex. 101 ¶¶ 116-

16  117.)

17         Accordingly, defendants have not shown Matsushita lacks evidence to establish the

18  accused devices literally meet the "voltage control oscillation means" limitation.

19  **D.  Inducing Infringement of '475, '238, And '249 Patents**

20         Matsushita does not assert MediaTek has directly infringed the '475, '238, and '249

21  Patents.  Rather, Matsushita asserts that MediaTek has induced OPPO, MSI, and third

22  parties to engage in direct infringement.  Defendants argue that, assuming the accused

23  devices sold by MediaTek to OPPO, MSI, and third parties infringe one or more claims at

24  issue herein, Matsushita lacks evidence to prove MediaTek induced OPPO, MSI, or any

25  third party to infringe.[17]

26

27         [17]As discussed above, defendants are entitled to summary judgment on
    Matsushita's claim of infringement of the '238 Patent, to the extent the claim is based on
28  devices other than B65169D, UE65189G, SE65189F, VE65189F, and BE65189C, and are
    entitled to summary judgment on Matsushita's claim of infringement of the '249 Patent, to

1    "Whoever actively induces infringement of a patent shall be liable as an infringer."

2    35 U.S.C. § 271(b).  "To establish liability under section 271(b), a patent holder must prove

3    that once the defendants knew of the patent, they actively and knowingly aided and abetted

4    another's direct infringement."  DSU Medical Corp. v. JMS Co., 471 F. 3d 1293, 1305 (Fed.

5    Cir. 2006).  "However, knowledge of the acts alleged to constitute infringement is not

6    enough."  Id. (internal quotation and citation omitted).  "The mere knowledge of possible

7    infringement by others does not amount to inducement; specific intent and action to induce

8    infringement must be proven."  Id. (internal quotation and citation omitted).  Stated

9    otherwise, "[t]he plaintiff has the burden of showing that the alleged infringer's actions

10   induced infringing acts and that he knew or should have known his actions would induce

11   actual infringements."  See id. at 1306 (internal quotation and citation omitted) (emphasis in

12   original).

13        At the outset, defendants argue Matsushita lacks evidence to prove that any product

14   incorporating an accused device sold by Mediatek has been sold or offered for sale in the

15   United States.  See id. at 1303 (holding "patentee always has the burden to show direct

16   infringement for each instance of indirect infringement").  The Court disagrees.  Matsushita

17   has offered evidence that products sold in the United States by defendants OPPO and MSI

18   incorporate accused devices sold by Mediatek, (see Badini Opp. Decl. Ex. 3 at 70:23 -

19   71:11; id. Ex. 4 at 74:8-21), and that numerous third parties have imported into and/or sold

20   in the United States products incorporating accused devices sold by Mediatek, (see id. Ex.

21   19 ¶¶ 4-6, 9; id. Ex. 42 at 110; id. Ex. 23; Yang Decl. ¶¶ 2-10; Garcha Decl., filed April 20,

22   2007, ¶¶ 2-21 ).

23        Defendants also argue that Matsushita lacks evidence to prove Mediatek engaged

24   in any act that induced infringement and, further, that Matsushita lacks evidence to prove

25   MediaTek engaged in such acts "with the intent to encourage the infringement."  See DSU

26   _____

27   the extent the claim is based on MT1155 .  Accordingly, the Court considers the instant
     argument as it pertains to all remaining infringement claims made by Matsushita against
28   MediaTek.

21

1   Medical Corp., 471 F. 3d at 1305.

2           Where a defendant has notice from the patent holder that the patent holder believes

3   the defendant's devices infringe, and, thereafter, the defendant engages in actions to assist

4   others to sell in the United States products that incorporate the accused devices, a trier of

5   fact can reasonably infer the defendant intended to induce infringement.  See Golden

6   Blount, Inc. v. Robert H. Peterson Co., 438 F. 3d 1354, 1364 n. 4 (Fed. Cir. 2006) (holding

7   sufficient evidence supported trier of fact's finding defendant intended to induce

8   infringement, where defendant had notice of patent and thereafter provided "instruction

9   sheet" to customers that explained how to assemble device that infringed); MEMC

10  Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F. 3d 1369, 1379-1380

11  (Fed. Cir. 2005) (holding defendant not entitled to summary judgment on issue of

12  inducement, where defendant had notice of patent and thereafter provided to customer in

13  United States "product support which enabled [the customer] to purchase and use the

14  accused wafers"); see also Wing Shing Products (BVI), Ltd. v. Simatelex Manufactory Co.,

15  479 F. Supp. 2d 388, 408-11 (S.D. N.Y. 2007) (holding defendant not entitled to summary

16  judgment on issue of inducement, in light of evidence that after defendant learned of

17  plaintiff's patent, defendant continued to manufacture accused device and ship it to

18  customer in United States).

19          Here, Matsushita informed MediaTek, by letter dated October 8, 2004, of

20  Matsushita's belief that six of MediaTek's chipsets infringed a number of Matsushita's

21  patents, including the three Matsushita patents at issue herein.  (See Badini Decl. Ex. 15.)

22  Thereafter, MediaTek took steps to encourage companies to continue selling products

23  incorporating MediaTek's chipsets in the United States.  For example, in 2005, during the

24  course of an infringement action before the International Trade Commission ("ITC") brought

25  by Zoran Corporation, Mediatek advised its customers they could continue to sell products

26  in the United States that contained the chipsets accused in that action, irrespective of

27  whether the ITC might later issue an "exclusion order."  (See Badini Opp. Decl. Exs. 30-32.)

28  Matsushita asserts, and defendants have not disputed, that twelve of the chipsets accused

22

1   in the instant action were at issue in the ITC proceeding.  (See id. Ex. 42 at 110.)  Of those

2   twelve, two were identified in Matsushita's October 8, 2004 letter, specifically, MT1618 and

3   MT1628.  (See Badini Decl. Ex. 15.)  In other words, after MediaTek knew of Matsushita's

4   claim that six of MediaTek's chipsets infringed the three patents at issue herein, MediaTek

5   took steps to assist companies in their attempts to sell products containing two of those

6   chipsets in the United States.  Additionally, Matsushita has offered evidence that MediaTek,

7   following its receipt of the October 8, 2004 letter,  entered into indemnification agreements

8   with customers regarding their sales of devices accused in said letter, (see id. Ex. 54 at

9   2:21-23; Badini Opp. Decl. Ex. 48 at 9-10, 19), and designed chipsets after considering

10  what customers had requested or stated they needed in order to sell in the United States

11  products containing devices accused in said letter, (see id. Exs. 51, 52).[18]  Although a trier

12  of fact need not necessarily infer the requisite intent from such evidence, in the words of

13  the Federal Circuit in considering similar evidence, the Court is "not persuaded to hold that

14  a reasonable jury could not find intent to induce infringement."  See MEMC, 420 F. 3d at

15  1379.[19]

16  ────────────────

17  [18]Matsushita has offered evidence of other acts by MediaTek that, according to
    Matsushita, constitute acts of inducement.  Some of that evidence pertains to acts taken
18  with respect to devices not identified in Matsushita's October 8, 2004 letter, (see, e.g., id.
    Ex. 57; Pl.'s Opp. at 10:2-4 (describing action taken with respect to MT8015), while other
19  evidence does not identify any specific device or devices implicated by the act or acts,
    (see, e.g., Badini Opp. Ex. 56 (describing action taken with respect to "Argus" product, but
20  not identifying MediaTek device implicated thereby).)  As a consequence, such evidence
    does not support a finding that MediaTek, after obtaining notice on October 8, 2004 of
21  Matsushita's claim that six MediaTek devices infringed Matsushita's patents, thereafter
    engaged in conduct it knew or should have known would induce infringement.

22  [19]The evidence found to be sufficient in MEMC is not as extensive as that set forth in
    earlier-issued Federal Circuit cases cited therein.  See Fuji Photo Film Co. v. Jazz Photo
23  Corp., 394 F. 3d 1368, 1377-78 (Fed. Cir. 2005) (holding substantial evidence supported
    finding of inducement to infringe, where defendant, after learning of patent, twice requested
24  a license and thereafter "directed" company, controlled by defendant, to sell infringing
    devices, even after ITC found company's product infringed); Mentor H/S Inc. v. Medical
25  Device Alliance, Inc., 244 F. 3d 1365, 1379 (Fed. Cir. 2001) (holding substantial evidence
    supported finding of inducement to infringe where defendant sought license from plaintiff
26  and, after defendant was denied license, "continue[d]" to sell product to others).
    Nonetheless, MEMC has been cited favorably by the Federal Circuit, sitting en banc.  See
27  DSU Medical Corp., 471 F. 3d at 1306.  Accordingly, MEMC would appear to set forth the
    minimum amount of evidence the Federal Circuit deems sufficient to give rise to an
28  inference that a defendant at least "should have known" its device would infringe a patent.

1   Accordingly, defendants are not entitled to summary judgment on Matsushita's claim

2   that MediaTek induced infringement of the '475, '238, and '249 Patents.

3   **E.  Lost Profits**

4   Defendants argue that, in the event Matsushita demonstrates MediaTek is liable for

5   inducing others to infringe, Matsushita is not entitled to a remedy of lost profits.[20]

6   Defendants first argue Matsushita lacks evidence to establish Matsushita's products

7   compete with MediaTek's accused devices in the same market in the United States.  See

8   BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc., 1 F. 3d 1214, 1219 (Fed. Cir. 1993)

9   (holding patentee seeking to prove lost profits must show "patentee and the infringer sell

10  substantially similar products in the same market").  The Court disagrees.  Matsushita's

11  expert, Portia Isaacson Bass, Ph.D. ("Dr. Bass"), has (1) offered the opinion that a market

12  exists in the United States for "seven types of optical-storage products," which products

13  incorporate "chipsets" manufactured by various companies, including Matsushita and

14  MediaTek, (see Badini Opp. Decl. Ex. 21 ¶¶ 33-41), (2) calculated the specific percentage

15  of the "worldwide" market share of chipsets held by MediaTek, Matsushita, and others, (see

16  id. Ex. 21 ¶ 32), and (3) set forth the basis for her opinion that MediaTek's "U.S. market

17  share" for such chipsets is "at least as large as its worldwide market share," (see id. Ex. 21

18  ¶¶ 45-64).[21]

19  Defendants also argue the lost profits calculations on which Matsushita relies, which

20  calculations are set forth in the expert opinion of James E. Malackowski ("Malackowski"),

21  are based on the incorrect assumption that Matsushita's products practice the claimed

22  inventions.  Defendants contend such an assumption is fatal to Matsushita's claim for lost

23  profits because Matsushita, by stipulation approved by the Court on December 21, 2006,

24  _____

25  See id. at 1305 (approving jury instruction directing jury to find "defendant must have
    intended to cause the acts that constitute the direct infringement and must have known or
26  should have known that its action would cause the direct infringement") (emphasis added).

27  [20]Defendants do not raise this issue with respect to OPPO and MSI.

28  [21]By "U.S. market share," Dr. Bass refers to products sold in the United States by
    entities other than MediaTek, but which incorporate MediaTek's chipsets.

24

1   withdrew its earlier contention that Matsushita's products practice the claimed inventions.

2          The Court agrees with defendants that Matsushita cannot, in attempting to establish

3   that its products and the accused devices are substantially similar, argue that Matsushita's

4   products practice the claimed inventions, because Matsushita has specifically withdrawn

5   such contention.  Patent Local Rule 3-1(f) provides that "[i]f a party claiming patent

6   infringement wishes to preserve the right to rely, for any purpose, on the assertion that its

7   own apparatus, product, device, process, method, act, or other instrumentality practices the

8   claimed invention, the party must identify, separately for each asserted claim, each such

9   apparatus, product, device, process, method, act, or other instrumentality that incorporates

10  or reflects that particular claim."  See Patent L.R. 3-1(f) (emphasis added).  Although

11  Matsushita had originally contended, pursuant to Rule 3-1(f), that certain of its products

12  practice the claimed inventions, Matsushita later entered into a stipulation that required it to

13  "amend its Patent Local Rule 3-1(f) contentions to remove the list of 'embodying products."

14  (See Joint Stipulation and Order, filed December 21, 2006, at 2:10-11.)  Said stipulation, as

15  noted, was approved by order filed December 21, 2006, and attached to that order are

16  Matsushita's amended Rule 3-1 contentions, in which Matsushita does not identify any

17  products for purposes of Rule 3-1(f).  (See id., attachment thereto.)[22]

18          A claim for lost profits, however, is not dependent on the patent holder's offering

19  evidence that it has "made, used, or sold the patented device"; rather, a patent holder may

20  base a loss of profits claim on its having sold a "competing product not covered by the

21  patent within [the relevant] market."  See King Instruments Corp. v. Perego, 65 F. 3d 941,

22  947, 949 (Fed. Cir. 1995).  Consequently, the issue is whether the opinions set forth in

23  Malackowski's expert report are based on the assumption that Matsushita's products are

24  legally comparable to MediaTek's accused devices because Matsushita's products practice

25  the claimed invention.  In that respect, the Court finds defendants have not shown such

26

27          [22]Such amendment by Matsushita was not gratuitous.  Rather, as part of the
    agreement memorialized in the stipulation, defendants agreed to withdraw a then-pending
28  motion to compel Matsushita and Panasonic to produce certain documents relating to the
    products Matsushita had identified in its original Rule 3-1(f) contentions.  (See id. at 2:1-9.)

1   assumption necessarily underlies Malackowski's opinions, given that defendants fail to

2   point to any statement in Malackowski's expert report to that effect.[23]

3       Accordingly, defendants are not entitled to summary judgment on Matsushita's claim

4   for lost profits as against MediaTek.

5   **F.  U.S. Patent 5,970,031 ("'031 Patent")**

6       In its First Counterclaim, MediaTek alleges counterclaim defendants have infringed

7   the '031 Patent.  Counterclaim defendants argue MediaTek cannot establish its claim of

8   infringement.

9       Claim 1, the first of two independent claims of the '031 Patent, claims a "CD player

10  system with vibration-immune uninterrupted playback capability," which includes a "control

11  means" that, "in the event of the occurrence of a defocusing or mistracking condition,"

12  performs the following steps:  "disabling [the system's] EFM decoder; resetting [the

13  system's] CIRC decoder, fetching the information about which data frame is currently being

14  written into [the system's] memory means; commanding [the system's] servo means to

15  resume the data reading operation by positioning the laser pickup head at the previous one

16  of the data frame; and enabling said EFM decoder to restart the EFM decoding process

17  when the next subcode appears."  See '031 Patent, col. 8 ll. 23-24, col. 8 ll. 65 - col. 9 ll.

18  8.[24]  Claim 6, the other independent claim, claims a method for use on a specified type of

19  ─────────────

20      [23]In their reply, defendants assert in a footnote that Matsushita has not previously
    disclosed the "theory" that Matsushita's assertedly competing products do not practice the
21  claimed inventions, and that MediaTek has been "prejudiced by its late introduction."  (See
    Defs.' Reply, filed May 4, 2007, at 8:25-26.)  Matsushita served Malackowski's report
22  months after it had withdrawn its contention that its products practice the claimed
    inventions, and, consequently, it would seem apparent that Matsushita was not proceeding
23  on the theory that its products and MediaTek's products are comparable because they
    each practice the claimed inventions.  In any event, if defendants, in the context of a motion
24  in limine or otherwise, demonstrate a discovery violation with respect to evidence
    Matsushita seeks to offer at trial, the Court will consider the issue at that time.  See, e.g.,
25  Fed. R. Civ. P. 37(c)(1) (providing where party "without substantial justification" fails to
    disclose information required under Federal Rules, party is not "permitted to use [the
26  undisclosed] evidence at a trial," unless party demonstrates "such failure is harmless").

27      [24]Claim 1 refers to an "EFM encoder," see 031 Patent, col. 9 ll. 1, as does Claim 6,
    see id., col. 10 ll. 22.  As set forth in the Court's order of November 9, 2006, MediaTek
28  asserts, and counter defendants do not argue to the contrary, that those references are
    typographical errors, and the correct term is "EFM decoder."  (See also Rudd Decl., filed

                                        26

CD player system, wherein the system's control means, "in the event of the occurrence of a defocusing or mistracking condition," performs the same "steps" set forth in Claim 1.  See '031 Patent, col. 9 ll. 24-36, col. 10 ll. 19-29.

By order filed November 9, 2006, the Court construed "disabling said EFM decoder" as "stopping the flow of EFM decoded audio data," and construed "enabling said EFM decoder" as "restarting the flow of EFM decoded audio data."  (See Order Construing Claims at 6.)

Counterclaim defendants' expert, Walter G. Rudd, Ph.D. ("Dr. Rudd"), offers the opinion, based on his review of counterclaim defendants' source code and other information, that when the accused devices detect a defocusing or mistracking occurrence, "the flow of the EFM decoded audio data continues from the EFM decoder into the CIRC decoder," (see Rudd Decl. ¶ 10), and the accused devices "discontinue writing the CIRC decoded data to the memory," which discontinuation "has no effect on the operation of [ ] the EFM decoder," (see id. ¶ 11).  MediaTek's expert, Robert G. Wedig, Ph.D. ("Dr. Wedig"), states no disagreement with Dr. Rudd's description of how the accused devices operate upon detection of a defocusing or mistracking event; rather, Dr. Wedig opines that when the CIRC decoded data stops flowing to the memory, such action constitutes "stopping the flow of EFM decoded audio data," because "the data coming from the CIRC decoder is still EFM decoded audio data."  (See Wedig Decl., filed April 20, 2007, ¶¶ 25-28.)

The issue presented, both parties assert, is one of claim construction, or, more specifically, clarification of the Court's prior claim construction.  Counterclaim defendants argue the Court's construction of "disabling said EFM decoder" as "stopping the flow of EFM decoded audio data" refers to stopping the flow of data from the EFM decoder.  MediaTek, by contrast, argues that a "disabling" of the EFM decoder occurs when the "flow of EFM decoded audio data" is stopped anywhere along its flow path, irrespective of

_____

April 6, 2007, ¶¶ 6 (stating CD players have an "EFM decoder").)

1 whether the operation of the EFM decoder is affected.

2 When the Court construed "disabling the EFM decoder" as "stopping the flow of EFM

3 decoded audio data," it did so for the reasons stated by MediaTek in connection with the

4 claim construction proceeding.  (See Order Construing Claims at 6.)  At that time,

5 MediaTek never stated that its proposed construction of "disabling the EFM decoder" would

6 encompass stopping the flow of data from an element other than the EFM decoder.  Under

7 MediaTek's revised proposed construction, the operation of the EFM decoder need not be

8 affected at all when the CD player detects a defocusing or mistracking event; rather, the

9 EFM decoder can continue to operate as if no such event was detected and, instead,

10 another component, such as the memory, would be affected.  MediaTek's newly-advanced

11 position is not persuasive.  In short, MediaTek fails to explain how the EFM decoder could

12 be "disabl[ed]," under any sense of that word, if data continues to flow without restriction

13 from said element upon detection of a defocusing or mistracking event.

14 Accordingly, the Court finds "disabling said EFM decoder" is properly construed as

15 "stopping the flow of EFM decoded audio data from the EFM decoder."[25]

16 Under such construction, it is undisputed that the accused devices do not infringe

17 the '031 Patent literally, because the flow therein of EFM decoded audio from the EFM

18 decoder does not stop upon detection of a defocusing or mistracking event.

19 With respect to the doctrine of equivalents, MediaTek relies on evidence that,

20 although the flow of EFM decoded data from the EFM decoder does not stop upon

21 detection of a defocusing or mistracking event, the data that is decoded by the EFM

22 decoder upon such detection, and which then flows from the EFM decoder, is, according to

23 Matsushita's engineer Masato Ichikawa, "meaningless data" or "garbage data" that "doesn't

24 correspond" to data stored on the CD, is "never output as sound," and to which "nothing

25

26 [25]In so ruling, the Court has not considered counterclaim defendants' argument
raised for the first time in their reply, or the evidence offered in support of such new
27 argument, specifically, that MediaTek is estopped from advancing the claim construction
set forth in MediaTek's opposition.  Accordingly, MediaTek's motion to strike such
28 argument from the reply and to strike evidence offered in support of the reply, or, in the
alternative, for leave to file a surreply, will be denied as moot.

1 happens" after it is decoded by the EFM decoder.  (See Chou Decl. Ex. O at 225:2 -

2 227:19.)  The Court finds a trier of fact, in reliance on such testimony, could reasonably

3 find the EFM decoder in the accused devices, upon detection of a defocusing or

4 mistracking event, ceases to operate, given that it only outputs unuseable data.  In other

5 words, a trier of fact could reasonably find the differences between the accused devices

6 and the '031 Patent with respect to the limitation "disabling the EFM decoder" are

7 insubstantial.[26]

8        Accordingly, counterclaim defendants are entitled to summary judgment on the issue

9 of the literal infringement of the '031 Patent, and are not entitled to summary judgment on

10 the issue of infringement under the doctrine of equivalents.

11                                    **CONCLUSION**

12        For the reasons stated:

13        1.  Defendants/counterclaimant's motion for summary judgment is hereby

14 GRANTED in part and DENIED in part, as follows:

15              a.  Defendants are entitled to summary judgment on Matsushita's claim that

16 defendants have infringed the '238 Patent as to all accused devices other than B65169D,

17 UE65189G, SE65189F, VE65189F, and BE65189C;

18              b.  Defendants are entitled to summary judgment on Matsushita's claim that

19 defendants have infringed the '249 Patent, to the extent such claim is based on accused

20 device MT1155;

21              c.  Defendants are entitled to summary judgment on to the issue of literal

22 infringement of Claims 1, 2 and 3 of the '249 Patent; and

23              d.  In all other respects, defendants' motion is DENIED.

24 //

25 //

26 ───────────────────

27 [26]Although counterclaim defendants argue that during the prosecution of the '031
Patent, MediaTek made statements that limited the range of equivalents, counterclaim
28 defendants fail to identify any statement by MediaTek indicating that a "disabl[ed]" EFM
decoder could not include an EFM that has ceased outputting any useable data.

2.  Matsushita and Panasonic's motion for summary judgment is hereby GRANTED in part and DENIED in part, as follows:

a.  As to claims 22 and 23 of the '238 Patent, Matsushita is entitled to summary judgment on to the issue of invalidity predicated on the best mode requirement.

b.  Matsushita and Panasonic are entitled to summary judgment on the issue of literal infringement of the '031 Patent; and

c.  In all other respects, Matsushita and Panasonic's motion is DENIED.

3.  Matsushita and Panasonic's motion to strike the declarations of Jeffrey Bokor, Lee Soon Peng, Chao Chun Twu, and Steven Wasserman is DENIED.

4.  Mediatek's motion to strike portions of Matsushita and Panasonic's reply in support of their motion for summary judgment or, alternatively, for permission to file a surreply, is DENIED.

**IT IS SO ORDERED.**

Dated:  June 29, 2007

_____
MAXINE M. CHESNEY
United States District Judge